**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **THE UNITED STATES OF AMERICA** | ) | |
| **v.** | ) | **CRIMINAL NO. 06-227 (RBW)** |
| **DARNELL JACKSON, ET. AL** | ) | |
| **Defendants.** | ) | |

**GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS**

## TABLE OF CONTENTS OF MOTION

I. **FACTUAL BACKGROUND** . . . . . . . . . . 4

II. **LAWRENCE BRYANT'S MOTIONS TO SUPPRESS WIRETAP EVIDENCE AND PHYSICAL EVIDENCE ARE WITHOUT MERIT AND SHOULD BE DENIED.** . . . . . . . . . . 18

A. The Legal Standards. . . . . . . . . . 19

i. The Wiretap . . . . . . . . . . 19

ii. The Search Warrant . . . . . . . . . . 21

. . . . . . . . . . 22

B. Necessity for the Wiretap was Established. . . . . . . . . . 23

C. The Affidavit Set Forth Sufficient Probable Cause for the Search. . . . . . . . . . 30

III. **DEFENDANTS' MOTIONS TO SUPPRESS STATEMENTS SHOULD BE DENIED.** . . . . . . . . . . 34

A. No Motion Filed by the Defendants Sets Forth Valid Legal or Factual Grounds for Suppression. . . . . . . . . . 34

i. The Defendant's Claims. . . . . . . . . . 34

(a) Adams . . . . . . . . . . 34

(b) Hargrove . . . . . . . . . . 35

(c) Downs . . . . . . . . . . 35

ii. The Written Waivers. . . . . . . . . . 36

iii. The Legal Standard. . . . . . . . . . 36

(a) Adams Was Not In Custody and Made Her Statements Spontaneously. . . . . . . . . . 37

(b) Hargrove Was Not Subjected to Interrogation and the Circumstances of his Search Were Not Oppressive or Unusual . 37

(c) Downs Was Not Subjected to Custodial Interrogation and His Statements Later Were Made After He Waived His Rights. . . . . . . . . . 38

IV. **DEFENDANTS' MOTIONS FOR A BILL OF PARTICULARS SHOULD BE DENIED.** . . . . . . . . . . 38

V. **THE DEFENDANTS' MOTIONS FOR A HEARING TO DETERMINE THE SCOPE OF THE CONSPIRACY SHOULD BE DENIED.** . . . . . . . . . 41

VII. **DEFENDANTS' MOTIONS FOR HEARING ON THE SCOPE OF THE CONSPIRACY, AND TO PRECLUDE ADMISSION OF CO-**

**CONSPIRATOR STATEMENTS SHOULD BE DENIED.** . . . . . . . . . . . . . . 44

**VIII. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

## I. FACTUAL BACKGROUND

In late 2005, members of the Federal Bureau of Investigations' Drug Squad (hereinafter "FBI") focused an investigation on a local drug supplier of phencyclidine (hereinafter "PCP"), Darnell Anthony Jackson. Investigators had learned through a variety of sources that Jackson and his co-conspirators were obtaining gallon quantities of PCP from an unknown source. That PCP was then being distributed in Washington, DC, and in the Maryland suburbs.

Through their investigation, agents learned that Jackson had a source of supply in the Compton area of Los Angeles County, California and that he regularly flew to California to meet with that source. After purchasing gallon quantities of PCP from that source, Jackson would have couriers deliver the drugs back to the Washington, DC area. Agents began obtaining travel records from JetBlue and later Southwest Airlines and learned that members of the conspiracy often traveled to Los Angeles. For example, Bernie Hargrove traveled to Los Angeles twice, including once in December 2005, and once before May 2006, and John Downs, III traveled once. Troy Hopkins took numerous trips to California from 2004 through 2006. Darnell Jackson took numerous trips to California from Dulles International Airport. Other members of the conspiracy traveled to California as well.

In March 2006, agents instructed a cooperating defendant (hereinafter "CS-1") to approach Jackson and request a quantity of PCP. In March 2006, Jackson and CS-1, traveled to Long Beach Airport. Once in Los Angeles, Jackson drove to the home of Tony Hilt, in Compton, California where he purchased a gallon of PCP. In Los Angeles, Jackson met with courier Dominique Washington, and purchased shampoo in large bottles. He then placed the PCP in the shampoo bottles and buried them in loosely-packed clothing in a suitcase. Ms.

Washington later checked her suitcase.  She then boarded a JetBlue flight at Long Beach Airport

and flew to Dulles International Airport (hereinafter "Dulles") in Northern Virginia.  Afterward,

she took a taxi to a Suburban Maryland hotel.  Bernie Hargrove picked up the PCP from Ms.

Washington and brought it back to his residence on 10th Street, SE, Washington, DC.  Jackson

and CS-1 boarded a later flight than that of Ms. Washington.  They arrived at Dulles and drove

directly to Hargrove's residence.  Along the way, Jackson telephoned John Downs, III from his

cellular telephone to advise Downs that he had been successful at getting PCP.  Using minimally

veiled language, Jackson told Downs that he could get together with Downs later to engage in a

PCP transaction.[1]  Once at Hargrove's house, Jackson and CS-1 met with Keith Roots and Bernie

Hargrove.  Jackson dispatched Roots to buy up some car starter fluid, the substance used by the

conspirators to dilute, or "stretch" the PCP so that they could sell a greater weight of the

substance and maximize their profits.  Jackson then sold 32 ounces of PCP to CS-1, whereupon

CS-1 left Hargrove's apartment and met with agents of the FBI.

During the investigation agents received material from JetBlue Airlines that revealed that

Jackson, Hargrove, Roots, and Ms. Washington would periodically take flights between Dulles

and Long Beach, California.  In a pattern that was familiar to agents, the conspirators would

rarely stay more than a day at their destination before returning home.  Further Jackson continued

to talk to CS-1 about the conspiracy.  In these soliloquies, Jackson revealed that he had a partner

named Troy (later identified as Troy Hopkins), a supplier named "T" (later identified as Tony

---

[1]     Investigation revealed that Downs worked at Jackson's club sometimes and was present during meetings where drugs and money were exchanged between some of the government's witnesses and Jackson.  Downs styled himself as a music producer and periodically sold PCP to acquire money.

Hilt), a helper named Dookie (later identified as Christopher Dobbins), and several couriers, including Ms. Washington. Also, he revealed the groups' practice of using car starter fluid to dilute PCP, and the group's occasional practice of adding other substances to the PCP liquid, such as crushed up MDMA ("ecstasy") pills, to hide the fact that some PCP batches were not as "good" (or potent) as others.

In May 2006, the United States obtained a court-authorized wiretap on the cellular phone of Darnell Jackson. As part of the administrative process at the United States Attorney's Office, a memorandum was delivered to Shavonne Rush, a Legal Assistant for then-Criminal Chief Steven Bunnell. Ms. Rush's job at the time was to log in any such memos. She was the person who received the memorandum in this case. On the evening after Rush received the memorandum in this case, Bernie Hargrove called CS-1 and warned him to stay away from Fats (Darnell Jackson) because the Feds (presumably the FBI) "are all over him." Agents learned that Shavonne Rush's sister was married to Bernie Hargrove's brother. Ms. Rush was later interviewed and admitted telling a person outside the U.S. Attorney's Office about the investigation. FBI agents later searched her desk and discovered Rush's cellular telephone bill which showed that she had made repeated calls to Hargrove. They also recovered photos of Hargrove from her desk.

Ms. Rush later admitted that she told Bobby Hargrove, the brother of Bernie Hargrove, to stay away from Jackson (because he was being investigated). Following this leak of information, Hargrove, who had sold drugs within the conspiracy periodically to obtain cash, distanced himself from his co-conspirators.

The wiretap began in early May 2006 and ran for a period of 30 days. During the course

of this wiretap, agents were able to identify the other members of the conspiracy and to begin to understand their roles. Agents determined that "Troy" was Troy Hopkins, who sometimes spoke to Jackson from the land line telephone in his parents' home on Lundy Drive in Lanham, Maryland. Further, it became clear that the Drug Enforcement Administration (hereinafter "DEA") had an ongoing investigation into Hopkins and that they had used cooperating informants to purchase drugs from Hopkins over the prior two years as further detailed below. The DEA was familiar with Hopkins' practice of selling drugs from his father's home as well as his practice of hiding weapons and drugs in the bushes outside his father's home.

Agents learned that Troy Chavious, Hopkins' nephew, was the helper of Troy Hopkins, and that Christopher Dobbins was the helper of Jackson. Jackson and Hopkins would often put their young assistants out on the front lines to insulate themselves from the likelihood of detection. Eager to make fast money, Chavious and Dobbins would often make deliveries of drugs or money to sources or customers. The two helpers would sometimes be tasked with sending money to couriers or helping in the repackaging efforts. Hopkins especially used Chavious to make airplane trips for him since Hopkins weighed over 400 pounds at the time and found airplane travel uncomfortable. When he sensed he might be under surveillance, Hopkins would send Chavious to investigate matters in his stead. Likewise, Jackson often dispatched Dobbins to meet with customers, or to pick up car starter fluid and Everfresh juice bottles to re-package the PCP for resale. In the meantime, Hopkins and Jackson would stay in the background taking a larger portion of the proceeds and meting out lesser payments to their underlings. In May 2006, Hopkins even accused Chavious of "stealing" from him, thereby claiming authority over the drug proceeds and a greater right to the ill-gotten gains.

Like Jackson, Hopkins also went to Hilt to get gallons of PCP from California or sent an underling in his place. He sometimes used other people not named in the Indictment to pick up the drugs and deliver payment, including but not limited to Gregory Gee, Scott Wages, and a number of suburban Maryland women. For the most part, Hopkins used women from California who were among the conspiracy's repertoire of couriers.

Like Jackson, Hopkins distributed downward to wholesale customers in Washington, DC, and suburban Maryland. Hopkins and Jackson frequently pooled their resources, as calls on the wiretap suggest, and they recruited financial backing from other persons not named in the Indictment but who were also members of the conspiracy.

Agents learned that William Henry Grey, Keith Roots, John Downs, and Lawrence Bryant were among the wholesale customers of Jackson. Bryant, Hargrove, Roots, and others routinely met Jackson for drug deals at the home of Wanda Owens, and several meetings between members of this conspiracy were videotaped at that location. The group had several other "comfort zones" where they would meet members of the conspiracy to exchange drugs and money, including the Safari Steakhouse, also called the Safari Nightclub.

As the investigation unfolded, agents confirmed that Tinesha Adams was an *uber* courier who made more trips than any other courier, and who recruited neighborhood women and men to carry PCP for the conspiracy.[2] Flight records and later-discovered evidence revealed that Adams, Lanika Franklin, Dominique Washington and a host of other women functioned as the conspiracy's repertoire of couriers, although there were many others as well, including some men

---

[2]     After Hopkins' girlfriend was caught with drugs at LAX in 2004, Hopkins switched his methods slightly and began using more California-based couriers.

and some relatives of Tinesha Adams.

As further evidence of their conspiratorial relationship, Jackson enlisted Hopkins' help in cooking and pricing cocaine. Specifically, Jackson asked Hopkins to help his recently paroled uncle, Darnell Kinard Jackson, by cooking cocaine for his uncle to sell so that he could make some fast money.

Soon agents learned of a specific shipment of drugs that they hoped they could intercept. In a telephone conversation between Hopkins and Jackson on May 21, 2007, the two men discussed buying PCP from Hilt. They also discussed getting "the people out on the 5:40 flight," noting that it was the last flight of the day (which is the last JetBlue flight scheduled on most days). In later calls the two men talked about getting three gallons of PCP from Hilt.

Shortly thereafter, a member of the conspiracy carried money to the supplier via JetBlue, traveling from Dulles Airport in the direction of California. In the same time frame, Jackson talked on the telephone about going "to see" Hilt, a normal event when the conspirators were actually going to get PCP.

On the 23rd of May, 2006, Adams and Franklin, known couriers, took the "red-eye" from Long Beach to Dulles Airport arriving in the morning hours of the 24th of May, 2006. The Dulles Airport Interdiction Team, a joint law-enforcement group. A few members of the task force approached the women and explained who they were. They explained that, due to the increased threat of terrorism in airports, they wanted to randomly search passengers bags and wondered if the women would agree to such a search. Throughout the search, the women were very calm as if nothing was wrong. As soon as the suitcase were opened the smell PCP came wafting out. Inside both women's suitcases were bottles of personal care items that contained PCP. These

personal care items included Tresemme and Infusium brand shampoo bottles, Listerine Whitening mouthwash, Boost protein drink and nail polish remover. Adams stated that she and Franklin bought all of the items from Walmart and that they had not opened the items since buying them at Walmart. While the agents acted perplexed, both women acted surprised by the discovery. Agents explained that they were going to have to test the items and they removed them from the luggage. After the FBI confiscated the PCP the women left and headed for the taxi queue.

Keeping with their established routine, the women took a taxi to the hotel where they normally stayed when delivering PCP to the conspirators. Once at the hotel, the women were instructed by Hopkins to move to a different room to make it harder for law enforcement to reach them. Hopkins dispatched Chavious, his underling, to check on the women and to determine if the PCP had actually been seized or was stolen.

The FBI knew the hotel was sometimes used by the conspirators and went to interview the desk staff about the women. However, agents were unaware at the time that Hopkins was so frequently at the hotel that he had become friendly with the desk staff. The desk staff later alerted Hopkins to the fact that the FBI had come to inquire about the women and Hopkins moved them at once to the apartment of a friend.

In the wake of the seizure, the chatter on the wire continued with Jackson and Hopkins discussing the implications of the seizure. In the days that followed, Hopkins took the women on a trip to South Carolina to keep watch over them until he could satisfy himself that they had not stolen his PCP. (Receipts later recovered at Hopkins' home corroborate the fact of this trip.) Eventually the couriers were permitted to leave, though they took different routes home.

Although the wire was terminated after 25 days, receipts, flight records, and cooperator testimony reveal that the conspiracy continued.

At the "take-down" on August 1, 2006, agents recovered evidence of the PCP conspiracy from the various defendants' homes.

The day of the take-down, Troy Hopkins spoke personally to Special Agent Jesus Gomez over the telephone. Gomez advised Hopkins that he had a warrant and should turn himself into authorities. Thereafter Hopkins fled the area and was not captured until May 2007. The search at Hopkins' father's house turned up a large amount of paperwork that supported the fact that Hopkins and Chavious had made several trips to California and had used the Days Inn in Lanham to house the couriers from California. In addition, agents found a hand-written note containing the chemical ingredients for PCP. In the house, agents found five firearms. In the yard, FBI agents found a digital scale, several packages of small, plastic zipper-style bags of the type used to package cocaine, pistols, and bottles of the type used to package wholesale quantities of PCP. In the house agents also found a money counter, and a room key from a hotel in Los Angeles not far from LAX. Many medical and personal documents linked Troy Hopkins to the house. Agents also found cans of car starter fluid in the garage area. In one of the bedrooms, agents located a receipt from a Target store in California dated July 1, 2006. The items purchased at Target included Listerine brand mouthwash, Tresseme brand shampoo, Krazy Glue, Boost protein drink, and peroxide, nearly the exact same items (down to the brand name) as were used to package the PCP that was seized in May 2006. Further, within various rooms of the house, agents located airline travel receipts for Hopkins which further showed that Hopkins traveled with other members of the conspiracy to source areas, letters from co-conspirators, a hotel receipt

from South Carolina for the dates the couriers were taken there, rental car receipts linking Hopkins to other members of the conspiracy, a number of photographs depicting Hopkins with other drug dealers in apparent social settings, and several postal package receipts.

In Lawrence Bryant's home, agents recovered letters from inmates in Federal prison, and several recent issues of F.E.D.s: The Original Street Bible and a Don Diva magazine, which glamorize the drug trade. The issues in Bryant's possession featured articles on successful drug traffickers, articles purporting to explain what sorts of communications the Federal Government could acquire through wiretaps, and articles about the criminal legacies of persons of high repute in the "gansta" world.[3] In addition, agents recovered paperwork that showed Bryant's credit information, recent home purchase, credit clearing efforts, and correspondence with bill collectors. Cooperators later explained that Bryant told them that he opted back into the drug trade to clear his bills because his legitimate work was not providing him with enough income to afford his new home and BMW.

Agents later learned that Jackson began supplying Bryant with PCP in approximately November 2005 and continued doing so through May 2006. Jackson often sold Bryant eight ounce quantities of PCP, at least twice. Later, Bryant began purchasing 16 ounce quantities of PCP for between $3,000 and $3,500. Sometimes Jackson sold to Bryant in the presence of other people. Bryant made others in the conspiracy believe that he sold his PCP in Park Chester and in Capitol Heights, Maryland. Prior to selling PCP to Bryant, Jackson sold cocaine to him,

[3] Examples of titles of articles contained in these magazines included the following: "Witness or Snitch: Is there a Difference," featuring a cartoon of a bludgeoned rat; "Carol Preston: Smuggled Nearly 1 Ton of Cocaine from Panama into the U.S.," featuring a photo of a smiling Preston; "26 Co-Defendant - Hundreds of Kilos of Coke - Over a Dozen Murders - *And No One Flipped*," featuring interviews with convicted felons.

sometimes in front of other witnesses, though the cocaine selling had been in years past.

On August 1, 2006, Special Agents knocked on Hargrove's door on 10th Street and forcibly made entry after knocking and announcing their presence. Hargrove was inside along with his wife and a child or children.

In the search of Bernie Hargrove's home, agents found some drug packaging material, receipts for wire transfers between Hargrove and CS-1, paperwork linking Hargrove to the apartment, and photos depicting Hargrove with members of the conspiracy at apparent social gatherings. Agents also recovered materials supportive of the claims made later by cooperators that Hargrove opted into the conspiracy when his rap business was not providing him with enough income. Further agents recovered a photo of Shavonne Rush, the former U.S. Attorney's Office secretary who leaked the fact of the investigation to Hargrove before the wiretap was authorized.

Hargrove was not questioned at the scene. Instead he was transported to the Washington Field Office. There, S.A. Timothy Ervin read Hargrove his rights from the FD-395 Advice of Rights form. Hargrove agreed to speak to agents without an attorney present and signed the form indicating his assent. Only then was he questioned by agents. Hargrove admitted to going to Los Angeles once or twice with Jackson. (Flight records reveal it was at least twice.) On these trips, Hargrove stated that he carried $5,000 cash on his person which he knew Jackson would use to buy PCP. Hargrove stated that Jackson had come to his apartment on 10th Street, S.E. with a gallon and a half of PCP in March 2006. Jackson diluted the PCP with car starter fluid. Hargrove said that Jackson sent Roots out to get the car starter fluid, and that Jackson paid Hargrove $100 for allowing him to mix and repackage the PCP in the 10th Street apartment.

Hargrove admitted to seeing Roots buy PCP from Jackson in the past more than one time. Hargrove admitted that was familiar with Lawrence Bryant stating that he thought Bryant was Jackson's cousin. Hargrove recognized Tinesha Adams from a photo, stating that she was a woman who showed him around Los Angeles and went in to purchase PCP with Jackson while the two men were in Los Angeles. Hargrove added that he had also seen Adams in Washington, DC before. Hargrove identified Dominique Washington and said that she came to Washington, DC because she and other women transported PCP from Los Angeles.

In Darnell Jackson's homes agents recovered numerous vanity photos depicting Troy Hopkins and Jackson posed together in various tableaus in nightclubs, vanity photos depicting Jackson, Hopkins and Hargrove posed in various together in various tableaus in nightclubs, airline receipts showing JetBlue flights on which Jackson, John Downs (misspelled "John Bowns") and Hopkins traveled together to Long Beach, a photo of the shed in rear of Jackson's Camelia Court address[4], photos of John Downs III asleep in Jackson's house and lounging in front of Jackson's house, and photos of Troy Hopkins making cell phone calls while seated in Jackson's house.

On August 3, 2006, agents also arrested John Downs, III. Special Agents Tucker Vanderbunt and Timothy Foster went to an address on Mossy Brink Road in Columbia, Maryland which they had identified as a possible address for Downs. The drive from the District of Columbia seemed like a long drive to the agents who mostly work in the immediate Washington, D.C. area, and possibly took about 30 to 45 minutes. S.A. Vanderbunt went to the

[4] In wiretap calls, Jackson instructs Downs to hide money for PCP in "the shed in the back of my house."

front door and rang the bell while S.A. Foster went to the back door of the town home residence. Downs emerged from within the residence after Downs' sister answered the door and informed agents that her brother was in the basement. Agents asked Downs to step outside of the home and they placed him under arrest as they simultaneously explained that they had a warrant for his arrest. Agents Vanderbunt and Foster called their fellow agents from a cell phone to tell them that they had located Downs and to prevent the other agents from continuing to search for Downs in other locations. While the agents were waiting, Downs executed a written consent-to-search his bedroom within the residence and his Range Rover. S.A.s Vanderbunt and Foster did not have a search kit and called upon their fellow agents to come and assist them. S.A.s Ervin, Gomez and Matthew Tillman drove from another location that was so far away that S.A.s Vanderbunt and Foster felt like it took over an hour. In keeping with their normal practice, agents called for assistance in the search so that no evidence was destroyed while they transported Downs.

Agents searched Down's bedroom finding a vanity photo depicting Downs with Jackson and several other people in a posed tableau in a nightclub. They also found various documents linking Downs to the room. Agents later discovered the keys and personal effects of Darnell Jackson in Downs' Range Rover, as well as an Ace pre-paid credit card receipt[5]. Because it was a normal practice to have two agents transport a prisoner for the agents' safety, S.A.s Foster and Vanderbunt took Downs back to the Washington Field Office in an FBI car only after back-up

---

[5] Some members of the conspiracy used prepaid credit cards because they look and function like Mastercards or Visa cards, but they require no established credit. They have become a common currency for drug traffickers as the government's witnesses will explain at trial.

agents arrived. While waiting for back-up agents to arrive, S.A. Foster asked Downs what game he was playing on his Nintendo machine. Downs replied it was NCAA-07. After the search was completed, Downs was transported back to the FBI building at 4th and F Streets, NW. At that point, agents advised Downs of his rights under Miranda. Downs agreed to speak to the agents and executed a written waiver of his rights. Downs stated that he became acquainted with Jackson at a party through their mutual interest in music production. Downs said that he started buying PCP from Jackson around June 2006, and that he bought PCP from Jackson approximately eight times. Downs indicated that he bought as little as one ounce of PCP and as much as four ounces each time. Downs admitted that he resold the PCP in the form of "dippers" (PCP dipped cigarettes) for $15 apiece. Downs claimed that he started selling PCP because he was out of work and was trying to go back to college. Downs had Jackson's wallet and keys in his Land Rover. Downs explained this by stating that he was supposed to give these items to female who was then going to take them to Jackson.

As the investigation unfolded even further, agents learned from cooperators (and corroborated by business records) that Tinesha Adams recruited her brother, her cousins, her neighbors, her own mother, and anyone else who was willing to engage in high-risk drug-running for fast cash. Once Adams knew she was wanted by law enforcement, she moved from her home to avoid being arrested. While the conspiracy was ongoing, she often partied and socialized with other members of the conspiracy here in the Washington metropolitan area, leaving her small child behind in the care of family members for days at time. Further, Adams sometimes skimmed PCP from the conspiracy's shipments for her own use. Indeed phone calls between Jackson and Hilt recorded during the wiretap feature Hilt complaining that Adams was high

while she was at his home to conduct drug business. In addition to the PCP she skimmed, Adams sometimes took a portion of the money owed to couriers as a commission to herself thereby casting herself as their leader and organizer. On that score, Adams' name appeared sometimes as the person booking the flights for the other couriers and she received payment for incidentals via wire transfers even when she was not the courier who was going to take the risk to transport the PCP across country. In many of the records of wire transfers and airlines flights Adams used addresses she was known to frequent near Hoover Street in Los Angeles and 126th Street in the City of Compton. In other records, she used addresses associated with the Maryland-based members of the conspiracy. After the take-down in August 2006, Adams moved apartments, protesting to other conspirators that she was not going to turn herself in until the government wanted less time, meaning a lower possible sentence. When she learned that Hopkins too had fled, Adams' brother's mother, Sadie White, rented an apartment for Hopkins so that he could base himself in Los Angeles and carry on with his PCP business while remaining at large. Eventually, Adams was arrested in Compton near a day care center. Adams called Sadie White at the time of her arrest to take her small child. At her initial appearance Adams falsely claimed to authorities that she was pregnant in an effort to get released. She further claimed that, despite all the evidence that she booked flights and received money, she was the merely the victim of identity theft. On the contrary, the government's investigation showed that Adams was definitely the person at the center of the effort to transport the PCP via aircraft. Further Adams' former job at Mona Park positioned her to meet many people in the gallon-quantity PCP trade that flourished near the Park and was fueled by the Mona Street Crips.

## II. LAWRENCE BRYANT'S MOTIONS TO SUPPRESS WIRETAP EVIDENCE AND PHYSICAL EVIDENCE ARE WITHOUT MERIT AND SHOULD BE DENIED.

Defendant Bryant Moves to suppress the wiretap evidence against him claiming that S.A. Timothy Ervin's rather comprehensive affidavit failed to establish necessity.[6]  Further, Bryant asserts that the search of his home was based on the wiretap calls between himself and Jackson, and that, should the wiretap be suppressed, so too should the evidence recovered at his home as it is the "fruit of the poisonous tree."  Wong Sung v. United States, 371 U.S. 471, 473 (1963).  In a second motion, Bryant asserts that the search warrant for his home was facially lacking in probable cause to such an extent that no one could rely on it in good faith.  Bryant also suggests, though certainly sub-textually, that on the date the warrant was executed, it was stale.  In support of these claims, Bryant's counsel presents this Court with a much-reduced version of calls quoted and interpreted in the affidavit, and he fails to reference other portions of the affidavit that bolster probable cause.  Bryant cites a series of cases that would only be applicable were the defendant charged with a single event case instead of a conspiracy and were the affidavit less complete.  Finally, Bryant also claims that the good faith exception should not apply to his case since the warrant was so facially deficient.  On the contrary to these claims, S.A. Ervin's affidavit in support of the wiretap clearly set forth the necessary factors to establish necessity to proceed with a wiretap.  Further, S.A. Ervin's affidavit in support of the search warrant of Bryant's home likewise set forth probable cause that fruits of his crimes could be found therein.  Therefore,

---

[6] The government agrees that Defendant Bryant has standing to assert this claim under 18 U.S.C. 2518(10)(a) inasmuch as his communications were intercepted.  He  has standing to seek suppression of only those telephone conversations to which he was a party. See Alderman, 394 U.S. at  176 (1969).("Such violation would occur if the United States unlawfully overheard conversations of a [defendant] himself ...](emphasis added). See also United States v. Poeta, 455 F.2d 117, 122 (2d Cir.), cert. denied, 406 U.S. 948 (1972).

Bryant's motions must be denied in full.

A. The Legal Standards.

i. The Wiretap

Title 18 U.S.C. §2518(1)(a) provides that each application for an order authorizing electronic surveillance must contain:

> A full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

Similarly, prior to granting an order authorizing a wiretap, an issuing judge must find, among other things, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §2518(3)©. These prerequisites to a wiretap are commonly known as the "exhaustion" or "necessity" requirement.

The purpose of the statutory exhaustion requirement is to ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime," and to inform the issuing judge of the difficulties inherent in the use of traditional techniques. United States v. Kahn, 415 U.S. 143, 153 n.12 (1974). However, "the burden that these provisions impose upon the government to show the inadequacy of normal investigative techniques is not great, and the adequacy of such a showing is to be tested in a practical and common sense fashion". United States v. Anderson, 542 F.2d 428, 431 (7th Cir. 1976); accord, United States v. Armocida, 515 F.2d 29, 38 (3rd Cir.), cert. denied, 423 U.S. 858 (1975); United States v. Webster, 473 F. Supp. 586, 595 (D.Md. 1979) (statutory burden on the government is not great in showing compliance with exhaustion requirement), aff'd, 639 F.2d 174 (4th Cir.),

cert. denied, 454 U.S. 857 (1981), modified on other grounds, 669 F.2d 185 (4th Cir. 1982), cert.

denied, 456 U.S. 935 (1991); United States v. Askins, 351 F. Supp. 408, 414 (D.Md.

1972)(government's burden of establishing exhaustion is not great).

Moreover, 18 U.S.C. § 2518(c) does not require the literal exhaustion of all normal

investigative techniques. United States v. Clerkley, 556 F.2d 709, 715 (4th Cir. 1977) ("police

need not exhaust every conceivable technique before making application for a wiretap"), cert.

denied, 436 U.S. 930 (1978). The statute requires only "'that the agents inform the authorizing

judicial officer of the difficulties inherent in the use of normal law enforcement methods.'"

United States v. Torres, 901 F.2d 205, 231 (2d Cir.) (citations omitted), cert. denied, 498 U.S.

906 (1990); United States v. Sobamowa, 892 F.2d 90, 93 (D.C. Cir. 1989) (the government is not

required to enumerate in its affidavit every technique or opportunity missed or overlooked), cert.

denied, 498 U.S. 825 (1990). Rather, the government need show only that other techniques

would be impracticable. United States v. Johnson, 696 F.2d 115, 123 (D.C. Cir. 1982); see also,

United States v. Torres, 908 F.2d 1417, 1422 (9th Cir.) (although generally a wire intercept

should not constitute the first step in an investigation, the government need not exhaust every

conceivable investigative technique in order to show necessity), cert. denied, 498 U.S. 905

(1990); United States v. Garcia, 785 F.2d 214, 223 (8th Cir.) ("affidavit need not explain away

all possible alternate techniques because investigators are not required to use wiretaps or

eavesdropping devices only as a last resort"), cert. denied, 475 U.S. 1143 (1986). A "standard of

reasonableness should be employed in measuring the affidavit against the statutory

requirements." United States v. Oriakhi, 57 F.3d 1290, 1298 (4th Cir.) (showing of necessity is

"'to be tested in a practical and commonsense fashion,' . . . that does not 'hamper unduly the

investigative power of law enforcement agents'" (citations omitted)), cert. denied, 528 U.S. 1091 (2000); United States v. Spagnuolo, 549 F.2d 705, 710 (9th Cir. 1977).

The United States Court of Appeals for the District of Columbia Circuit has recognized and applied the above-cited principles. United States v. James, 494 F.2d 1007, 1016 (D.C. Cir. 1974) ("Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely" [to succeed].). The Court has said that even though merely conclusory statements about necessity will not suffice, even conclusory statements "cannot rationally be separated from . . . preceding detailed descriptions of . . . investigative events," cert. denied 419 U.S. 1020 (1978); United States v. Sobamowo, 892 F.2d 90, 93 (D.C. Cir. 1989) (quoting Williams, 580 F.2d at 589).

ii. The Search Warrant

The affidavit in support of a search warrant must state probable cause to believe that evidence of a crime will be contained within the premises searched. Federal Rule of Evidence 41(d)(1). Further, the affidavit must state with particularity the property to be searched. Id. (e)(2). "There is a presumption of validity with respect to the affidavit supporting a search warrant." Franks v. Delaware, 438 U.S. 154, 171 (1978). In reviewing an affidavit for probable cause, "[c]ourts should not invalidate the warrant by interpreting the affidavit in a hyper-technical, rather than a common sense manner." United States v. Ventresca, 380 U.S. 102, 109 (1965). Only if a warrant is "so lacking in indicia of probable cause as to render belief in its existence entire unreasonable" should a warrant be invalidated. United States v. Leon 468 U.S. 897 (1984) Instead, the warrant should be viewed in terms of the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 238-239 (1983). Affidavits that set forth facts in support of conspiracy cases

are different than those that memorialize one-event crimes in that "[c]ourts have been considerably more lenient in assessing the currency of information supporting probable cause . . ." United States v. Schaefer, 87 F.3d 562, 568 (1st Cir. 1996); United States v. Dozier, 844 F.2d 701, 707 (9th Cir. 1988) cert. denied, 488 U.S. 927 (1988); In re Search Warrant Dated July 4, 1977, 667 F.2d 117, 135-36 (D.C.Cir. 1981).  Facts of past criminal activity that by themselves are too stale can be sufficient if the affidavit also establishes a pattern of continuing criminal activity so there is reason to believe that the cited activity was probably not a one-time occurrence." United States v. Wagner, 989 F.2d 69, 75 (2d Cir. 1993).  See also  United States v. Rivera, 928 F.2d 592, 602 (2d Cir. 1991) ("In investigations of ongoing narcotics operations, we have held that intervals of weeks or months between the last described act and the application for a warrant did not necessarily make the information stale."); United States v. Rowell, 903 F.2d 899, 903 (2d Cir. 1990) ("Narcotics conspiracies are the very paradigm of the continuing enterprises for which the courts have relaxed the temporal requirements of non-staleness.") The Court of Appeals for the District of Columbia Circuit has held residential searches are permissible in the absence of evidence that the residence was used for illegal activity, as long as there is a reasonable basis to conclude that relevant evidence will be found on the premises:

> ... observations of illegal activity occurring away from the suspect's residence can support a finding of probable cause to issue a search warrant for the residence, if there is a reasonable basis to infer from the nature of the illegal activity observed, that the relevant evidence will be found in the residence.

United States v. Thomas, 989 F.2d 1252, 1255 (D.C. Cir. 1991).  In Thomas, police officers acting on an informant's top that the defendant was selling cocaine in a certain location, made two controlled purchases of cocaine from him in the same area.  They later sought and

obtained a search warrant for his residence, located in a different area. The affidavit requested authority to search the defendant's residence for documents, books, ledgers and similar items as well as the clothing that the defendant wore during the controlled buys. In support of the request, the affidavit cited the affiant's experience which had taught him that drug dealers kept such items in their residences, Under those facts, the Court found that there was "substantial evidence" to support a finding of probable cause to issue the warrant. Id.

B. Necessity for the Wiretap was Established.

Measured by the applicable legal principles described above, including that of common sense, the wiretap authorization order issued in this case was amply supported by the government's showing of "necessity." The government was fulsome in its application in explaining all the investigative techniques it had undertaken before it applied for the wiretap authorization of Defendant Jackson's telephone. The affidavit submitted by S.A. Ervin in support of authorization for wire interceptions on defendant Jackson's telephone included purposes of the interceptions: determination of the full identities of co-conspirators, obtaining evidence to prove the guilt of participants in the illegal conspiracy in which Jackson was involved, identification of his suppliers and purchasers, identification of location of houses, apartments and other premises used in furtherance of illegal activity, and the existence, location and disposition of proceeds of the illegal drug trafficking activity.[7]

---

[7] The affidavit set forth the types of calls S.A. Ervin hoped he would intercept and how they would assist the investigation:

> 10. The types of communications sought to be intercepted are communications evidencing: (a) the date and time of telephone calls made to the target telephone by co-conspirators, customers, and other criminal associates of DARNELL ANTHONY JACKSON; (b) the telephone numbers of co-

As set forth in the affidavit, several less intrusive investigative techniques had been used or contemplated and found insufficient to accomplish the goals of the investigation. The techniques included analysis of pen register data, air time records, airline records, surveillance and cooperating witnesses. Agent Ervin explained with respect to each of these investigative techniques, as well as others such as search warrants and grand jury subpoenas, the results of using the technique, and/or why it was not used or would not work.[8]

---

> conspirators, customers, and other criminal associates of DARNELL ANTHONY JACKSON; (c) the identities of co-conspirators, customers, and criminal associates of DARNELL ANTHONY JACKSON (based upon subscriber information derived from the telephone numbers intercepted under this authorization); (d) the dates and times for the commission of the aforementioned offenses, based upon the dates and times provided when co-conspirators, customers, and other criminal associates of DARNELL ANTHONY JACKSON call the target telephone; and (e) the weights, purchase prices, and other information about the controlled substances to be distributed based upon the weights, purchase prices, and other information about the controlled substances provided when co-conspirators, customers, and other criminal associates of DARNELL ANTHONY JACKSON call the target telephone. Your affiant believes evidence concerning the above-described offenses will be obtained through the interception of communications to and from the target telephone and that such communications will be admissible evidence of the offenses.
> See Jackson Affidavit at 5.

[8] See Jackson Affidavit at 33-37.

> 74. While the FBI investigation might be able to introduce an undercover agent to make narcotics purchases from DARNELL ANTHONY JACKSON and others, it is believed the undercover officer would not be able to assist in identifying the Los Angeles supplier of PCP, or understanding the manner in which large quantities of PCP are produced and distributed in Los Angeles. In addition, the undercover agent would not be able to identify all of the other members of the organization assisting DARNELL ANTHONY JACKSON and the other subjects listed above in obtaining and redistributing large quantities of PCP.

---

Further, the undercover agent would not be able to determine how the subjects dispose of the proceeds of their operation. While an undercover investigation might be probative of the nature of DARNELL ANTHONY JACKSON's ongoing illegal narcotics business, such efforts would not yield sufficient evidence of the full scope of the illegal operation. The introduction of an undercover agent would appear to have less value than the reporting of CW-3, who, as noted above, has already penetrated DARNELL ANTHONY JACKSON's organization to a considerable extent. DARNELL JACKSON has told CW-3 that he recently introduced another man (known only by the nickname "TROY") to his Los Angeles supplier. "TROY" obtained a large quantity of PCP from the supplier but never paid for it. As a result, DARNELL ANTHONY JACKSON is hesitant to introduce anyone else to the supplier.

75. Based on information provided by CW-1, CW-2 and CW-3, surveillance by the FBI, and the review of airline records, it appears that DARNELL ANTHONY JACKSON has a steady supplier of gallon quantities of PCP in Los Angeles (possibly TONY HILT). The basic methodology employed appears to be DARNELL ANTHONY JACKSON (and sometimes one other associate) flying to Long Beach on Jet Blue Airways with large quantities of $100 bills concealed on his person. TINESHA ADAMS, DOMINIQUE WASHINGTON, and SHAWNTAE ANDERSON act as couriers. Each woman can transport one gallon at a time on Jet Blue flights from Long Beach to Washington Dulles. If DARNELL ANTHONY JACKSON needs two gallons transported, two of the women travel together. The couriers usually travel with the PCP back to Washington, D.C. on the same evening DARNELL ANTHONY JACKSON arrives in Long Beach. Review of Jet Blue records for the period September 1, 2005 through April 6, 2006 has located 16 round-trip flights made from Long Beach to Washington Dulles by TINESHA ADAMS and/or DOMINIQUE WASHINGTON and/or SHAWNTAE ANDERSON. However, review of those records for the same period has located only four (4) round-trip flights for DARNELL ANTHONY JACKSON, and/or KEITH ROOTS, BERNIE HARGROVE or the CW. As a result, it is not known how, or even if, DARNELL ANTHONY JACKSON traveled to the Los Angeles area before the couriers came to Washington. It is believed DARNELL ANTHONY JACKSON travels under a different name or on a different airline. The FBI has also sent administrative subpoenas to five other airlines (United Airlines, U.S. Airways, Alaska Airlines, Delta Airlines, and America West) which fly the Washington, D.C. to Los Angeles route. None of those airlines had any record of travel under the name "Darnell Jackson." It is also not known if DARNELL ANTHONY JACKSON is able to send money to the Los Angeles supplier (possibly TONY HILT) in a way that does not require him to travel. It is believed that the interception of wire communications is

the only way to determine the complete methodology used by DARNELL ANTHONY JACKSON, the couriers, and the supplier to transport gallon quantities of PCP into this area.

76. While the investigation to date has determined DARNELL ANTHONY JACKSON is responsible for the distribution of substantial quantities of PCP in the Washington, D.C. metropolitan area, the investigation has been unsuccessful in identifying all the primary purchasers within Maryland and the District of Columbia of the wholesale quantities of PCP being distributed by DARNELL ANTHONY JACKSON. Your affiant considers identification of such wholesale purchasers as a significant objective of this investigation, particularly in view of the often violent activities associated with the intermediate-level trafficking groups. While it is possible that an undercover agent dealing with the conspiracy might encounter other customers, it is unlikely since neither those customers nor DARNELL ANTHONY JACKSON willingly expose their illegal activity to others. Moreover, while the use of an undercover agent might yield some limited information and evidence regarding DARNELL ANTHONY JACKSON, it is unlikely that DARNELL ANTHONY JACKSON would disclose anything to the undercover agent which would further identify the Los Angeles supplier of PCP. It is my experience that a narcotics distributor almost never discloses his source of supply to his customers for fear of the customers dealing directly with the source of supply. Additionally, in my experience, for security reasons, most suppliers will not deal with their customers' customers.

77. Based on my experience, and given the secretive nature of the illegal drug business, an undercover investigation, if attempted without the interception of wire and electronic communications, would yield no significant new evidence of the full scope of the illegal drug business. Investigation has determined that DARNELL ANTHONY JACKSON and "T's" (who is possibly TONY HILT) organization is secretive and close-knit. Even though DARNELL ANTHONY JACKSON was willing to bring CW-3 with him to Los Angeles, he was not willing to introduce CW-3 to the supplier, or even allow CW-3 to see the neighborhood where the supplier resides. If the undercover agent investigation were attempted in the absence of the interception of wire communications, it is extremely unlikely that members of the organization would disclose to the undercover agent either the identity of any sources of supply or the full scope of the organization's illegal activities.

Defendant Bryant asserts that each of the investigative means of S.A. Ervin were succeeding and would have achieved the goals of the investigation. This assertion is contradicted by the facts and it ignores some the feature realities of the investigation: 1) that Jackson was disinclined to introduce the cooperating witnesses to his source and said so to the cooperating witness; 2) that Jackson had deliberately left the cooperating witnesses behind when meeting with the source, and; 3) most specifically, that Jackson had complained vociferously that "Troy" had failed to pay his source thereby causing him to become even more reluctant to introduce anyone to his source than he had been before this breach of trust had occurred. Finally despite the modicum of success that attends almost all investigative efforts, and did in this case, no cooker of PCP was found in the pre-wire investigations, and the scope of the conspiracy was never understood until after the wiretap. Therefore it was unlikely that the conventional investigative techniques would have worked to complete the investigation.

Though Bryant tries to characterize the pre-wiretap investigation as a success, it did not reveal the true identity of Jackson's partner, Troy Hopkins, an even bigger supplier of PCP than Jackson. Nor did it allow the agents to connect their fledgling investigation to the two-year long DEA investigation into Hopkins which had also not resulted in success. It did not even reveal the identity of the men Hopkins and Jackson sent forth to Los Angeles to pay money: Christopher Dobbins, Troy Chavious, Scott Wages, and others. Therefore, all of these supposedly successful methods did not reveal the scope of the conspiracy or achieve many of the goals set forth by S.A. Ervin, which counsel for Defendant Bryant reduces to one - the full identity of the supplier, Tony

Hilt.

Further, Bryant's motion asserts that the FBI should have been able to tell when individuals were going to fly on JetBlue Airlines, stating that they could have been "tracked," though he does even say what he means by this term.  Bryant does not state what conventional methods would have achieved the goals of this investigation.  A common sense analysis of the pre-wire investigation reveals that the wire was necessary and that investigation methods employed prior to that time were not achieving the goals of the investigation.  Further, the scope of the conspiracy was completely unknown since agents had not yet even heard of Hopkins, Chavious or Dobbins, to name only some of the conspiracy's major players.  It bears noting that, during the wiretap, agents learned that Hopkins also supplied Jackson at times.  Therefore another supplier of Jackson was not known until after the wiretap was authorized.

The assertion that agents should have engaged in further investigative methods misunderstands the resources available to the FBI and imagines a scenario wherein full squads of the FBI might be used to set up round-the-clock surveillance on numerous residences, airports and hotels.  It assumes, incorrectly, that the female couriers in this case had consistent, valid addresses, or were on a particular schedule.  A cursory reading of the flight patterns shows that these women did not fly on a schedule and they rotated so that it could never have been clear to agents which courier might be the one to travel.  As subsequent investigation revealed, many of he couriers were unknown to S.A. Ervin at the time of his application so he could not have divined their identities in order to subject them to these "traditional law enforcement" techniques.  It is patently unrealistic to imagine how the FBI could have known when these people were going to fly when they often purchased tickets over the telephone or internet (using many different internet

accounts as the flight records possessed by counsel show), and sometimes paid cash in person. Flights were in most instances booked only a day or less in advance. Also, it is unclear how "tracking" these women would have revealed the scope of the conspiracy. Further it ignores the fact that members of this conspiracy sent "money men" forward in advance of such flights, many of whom were unknown to law enforcement at the time. These trips by money men functioned as triggering events, prompting the couriers to be contacted for a trip. Without knowledge of the identity of these money men and their hap-hazard schedule, there was no way for the agents to have predicted such travel by the conspirators. No schedule existed for the conspirators as exists in a legitimate corporate world. In other words, Bryant's assertions about what the FBI should have done do not consider any practicalities of investigation, personnel resources, the nature of drug conspirators, or the actual value of "tracking" a rotating fleet of drug couriers that expanded throughout the investigation. Agents are not obligated to perform super-human, and super-budgetary, or super-prescient tasks to satisfy the necessity requirements of the Federal law. To require such investigative measures would be to hold agents to a standard possible only in one-hour fictional television. Neither were such imagined standards required of the agents in the cases cited by Bryant's counsel in his motion. Indeed, it bears noting that the D.C. Circuit Court found ample necessity in both cases cited by counsel for Defendant Bryant (United States v. Cooper, 85 F.Supp. 2d. 1, 33 (D.D.C. 2000) (apparently meaning to cite pages 41-42 of that opinion), and United States v. Johnson, 696 F.2d 115, 123 (D.C.Cir. 1982)) where most of the same methods were used as in the instant case, and where the investigations had lasted approximately the same length of time as in the instant case.

Therefore S.A. Ervin's affidavit correctly set forth facts sufficient to show that a wiretap

was necessary. The motion by Bryant to suppress the wiretap evidence must be denied and also the sub-motion to suppress evidence located at his home as "fruit of the poisonous tree."

C. The Affidavit Set Forth Sufficient Probable Cause for the Search.

The affidavit in this case was 31 pages long and set forth a full description of the narcotics conspiracy that was then afoot. Bryant was listed among the wholesale customers of Jackson.[9] The affidavit clearly sets forth the scope of the conspiracy including the role of each conspirator. Bryant was among the wholesale customers of Jackson. Affidavit, p. 8 ("Persons suspected of receiving PCP from JACKSON include, but are not limited to, LAWRENCE BRYANT, WILLIAM HENRY GRAY, . . .") This statement is repeated in the affidavit. Affidavit, p. 9, ¶10. Ervin further outlined what happened to the drugs after reaching BRYANT and other members at his level of the conspiracy, stating, "[t]hese drugs eventually make their way to the lowest-level members of the organization who drugs to the actual users." Id. Throughout S.A. Ervin's affidavit, he recites other calls which give a larger context to the calls between Jackson and Bryant, a fact not noted by Bryant. *See* Affidavit at 24 (On May 13, 2006, William Henry Gray called Jackson and asked for a half, whereupon a conversation about prices and quantities of drugs ensued).[10] When Bryant does reference call, Bryant abbreviates calls to suit the purposes of his

---

[9] The conclusion paragraph of S.A. Ervin's affidavit states, "Based on the foregoing information, I submit there is probable cause to believe that HILT, JACKSON, HOPKINS *and their criminal associates* are involved in an ongoing conspiracy to distribute narcotics . . ." (Affidavit, p. 30, emph. added.) Bryant claims that this failure to mention him by name means that S.A. Ervin conceded that there was no probable cause. The government would note that the affidavit listed probable cause to believe that Bryant was involved in the drug conspiracy on several pages of the affidavit and that this reading of the agent's intent makes no sense.

[10] This call was recorded at 8:41 a.m., mere minutes after the exchange between Bryant and Jackson. Id. In a call later that morning, Jackson spoke to Gray again and the two men were observed driving between various locations associated with the conspiracy, such as the Safari

motion. For example, one of the calls Bryant says contained only a short conversation about "cheese," a common street term for money. The call also contained a dialogue about getting like "20." Bryant Motion to Suppress Evidence, p.2. In fact, on page 22 of the Affidavit, S.A. Ervin noted that, less than 30 minutes after this call with Bryant, Jackson talked to Troy Hopkins. In that call, Hopkins stated that he "just got two back" and he wanted to know if Jackson could help him get rid of them. Jackson replied that he would want to "put at least a 16 or a 32 on it." The coded nature of the conversations was obvious and placed Bryant's calls into a larger context, making his reference to figures and cheese more obviously drug calls, and establishing the reasonableness of S.A. Ervin's interpretation of the calls. Further the calls viewed as a whole establish the ongoing conspiratorial nature of the group, including Bryant. Further, S.A. Ervin also noted that Bryant had been espied during surveillance meeting Jackson at one of the groups comfort zones, Wanda Owen's home in Southeast, D.C. Approximately two days later, Bryant and Jackson spoke again. This time, Bryant advised Jackson that the "joints [were] gone," prompting Jackson to ask Bryant if he had the "change," meaning the money he owed Jackson for the drugs. Affidavit at 24. Bryant asked to have until that evening. Id. In the last call, Jackson can be heard telling Bryant that he needs to get that, again referring to the money owed. Id. After two days of hearing Jackson asking for his change, and talking with other members of the conspiracy about money and drugs, the agent reasonably concluded that this call meant that Jackson needed Bryant to pay up for the drugs he had received. Id. In addition to summarizing the calls, S.A. Ervin also described the larger conspiracy, including the group's practice of getting PCP in California, using couriers, making sales of specific quantities of PCP that then informed

---

Steak House and Hopkins' parents' residence on Lundy Drive.

the agent's interpretation of the calls. Affidavit at 7-19,. The agent went on to detail the roles of the various conspirators, including Bryant. Id. Most importantly, S.A. Ervin specifically states that Bryant "is a distributor of PCP in the Washington Metropolitan Area. He is supplied with PCP by DARNELL JACKSON." Affidavit at 23. Therefore Bryant's claims that "the government's evidence merely raised 'suspicions,'" and that, in the conclusion section of the affidavit "Agent Ervin does not expressly state that there is probable cause as to Mr. Bryant . . . leaving open the question whether the allegation is intended to specifically refer to Mr. Bryant, who is only a 'suspect,'" are misleading. Bryant Motion at 2. The question of Bryant's involvement was not left open by the agent.

Bryant fails to note that S.A. Ervin also noted that the cellular phone used by Bryant to communicate with Jackson was subscribed to in Bryant's own name with the billing address being the Black Oak Court address. Affidavit at 28. Bryant fails to mention that the affidavit also states that the vehicle driven by Bryant to meet Jackson for a drug sale (a maroon Chevy Tahoe) was registered to Bryant at that address. Id. at 24 and 28. Bryant also fails to reveal that S.A. Ervin's affidavit states that the same Chevy Tahoe was seen parked at the Black Oak Court address on three different mornings, July 5, July 13, and July 19, 2006, the latter date being less than two weeks before the search warrant was executed. Id.[11]

Considering the language of Schaefer, infra. 87 F.3d at 568, that courts are "more lenient

[11] Bryant does not specifically complain that the affidavit was stale, however he certainly implies as much by stating that the agents were without probable cause to search Bryant's house on August 1, 2006. Bryant Motion at 3. Under Wagner, infra 989 F.2d at 75, Rivera, infra 928 F.2d at 602, and Rowell, infra 903 F.2d at 903, once the continuing nature of the conspiracy is established, staleness is less likely to be an issue. Those cases all held that delays months longer than the one here did not render those warrants stale.

is assessing the currency of information supporting probable cause" in conspiracy, there can be no doubt that the affidavit submitted by S.A. Ervin established a conspiracy that had been ongoing for a year, and that Bryant was a participant.  Looking at the affidavit a whole, and considering the calls between Bryant and Jackson along with the calls to the other conspirators, common sense would suggest that probable cause was very clearly established for Bryant's involvement in the conspiracy.  Further is it also clear that his involvement was not in the nature of a one-time occurrence, given his use of coded language, which obviously showed Bryant's familiarity with these codes, and Jackson's invitation to Bryant to Wanda Owens' in Southeast Washington, D.C. where other drug deals had taken place and where members of the conspiracy met often.[12]

Viewing the totality of circumstances along with all of the facts set forth in the warrant, there was probable cause to search Bryant's home on Black Oak Court and his motion to suppress should therefore be denied.

As a residual issue, Bryant suggests that the affidavit was so lacking in probable cause that the good faith exception to the warrant rule should not apply.  In support of this position, he cites to an opinion authored by Judge Paul L. Friedman, which dealt with an affidavit that was based on a single criminal event.  United States v. Johnson, 332 F.Supp.2d, 35, 39-40 (D.D.C 2004).  There is nothing about the facts of Johnson that should be instructive to this Court in the reviewing the affidavit in the instant conspiracy case.  Unlike the officer in the Johnson case, S.A. Ervin clearly linked Bryant to the address in question and to the conspiracy.  Assuming that the instant affidavit had any deficiencies, which it most clearly did not, there is no indication that a reasonably well-

---

[12]  See Affidavit at 8.  S.A. Ervin stated that Jackson's sister, Wanda Owens, assisted Jackson in the distribution of PCP.  S.A. Ervin later notes that in the call between Jackson and Bryant on May 16, 2006, Jackson told Bryant to meet him at his sister's house.  Affidavit at 24.

trained officer should not known it was deficient in any way. Such a claim by Bryant simply ignores the scope and breadth of the instant affidavit. Therefore this opinion is not instructive. The good faith exception to the warrant rule would certainly apply in this situation, and the motion to suppress should be denied.

## III. DEFENDANTS' MOTIONS TO SUPPRESS STATEMENTS SHOULD BE DENIED.

Defendants Hargrove, Adams, and Downs move this Court to suppress their statements to law enforcement. These motions are without merit and should be denied.

### A. No Motion Filed by the Defendants Sets Forth Valid Legal or Factual Grounds for Suppression.

#### i. The Defendant's Claims.

##### (a) Adams

Adams moves this Court to suppress statements she says were taken against her will at Dulles Airport during the time that he luggage was searched and PCP was found and then permitted to leave. Further, she claims that the statements taken from her during custodial interrogation. Further, despite the fact that Adams' luggage was seized after calls on the wiretap revealed that the conspirators were getting ready to move a load of drugs, Adams claims that agents were lacking even a reasonable suspicion that Adams was carrying drugs under Terry v. Ohio, 393 U.S. 471, 473 (1968). Adams motion must fail for several reasons. First, Adams consented to have her suitcase searched. Second, all persons traveling aboard commercial aircraft know and expect that their luggage will be searched. Third, Adams was not ever held in custody, and instead was allowed to remain free while her luggage was searched and afterwards. Essentially Adams argues that she was held in custody and was tricked into giving her statement,

a claim which is fully undercut by the facts of the case.

(b) Hargrove

Hargrove moves this Court to suppress his statements to police following his written waiver of his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 441 (1966). Setting forth scant facts to support his claims, Hargrove asserts that, because his house was searched and he was told about the case against him, his will was overborne. Indeed he claims his will was so shattered that his later written waiver of rights in invalid. Further he claims that, because agents did not advise him of his rights on the scene of the search warrant, his later, post-rights statements are inadmissible. Essentially Hargrove wants this Court to believe that he was coerced, placed under duress and deceived into making statements and agreeing to waive his rights. Hargrove's motion must fail since he was not questioned on the scene of the search warrant, he was later fully advised of his rights, he memorialized his waiver in writing, and he clearly and unambiguously agreed to talk to agents after signing a written waiver.

(c) Downs

Finally, John Downs III claims that he was questioned for hours by FBI agents before he was read his constitutional rights in and episode of agent intimidation, so fatiguing his fortitude that he broke down, waived his rights in writing and gave a statement. Unless the agent's inquiry about the Ninendo game was questioning, Downs' claim in false and is fully refuted by the facts. Furthermore, Downs was later read his rights before any questioning of him occurred and he agreed in writing to talk to agents. Therefore his motion is also without merit and should be denied.

ii. The Written Waivers.

Because Downs and Hargrove executed written waivers wherein they agreed to give up their right to remain silent and have counsel present, they cannot now claim that these waivers are invalid. Indeed no defendant sets forth any fact nor cites any specific case which stands for the proposition that their statements must be suppressed. Neither do any of the defendants aver that they requested the presence of an attorney during questioning.

iii. The Legal Standard.

Adams, Downs and Hargrove argue that their statements were the product of custodial interrogation during which they were subjected to coercion, duress and deceit. "In determining whether a defendant's will was overborne in a particular case, the Court [should] assess[] the totality of the circumstances - both the characteristics of the accused and the details of the investigation." Cooper v. United States,85 F.Supp.2d 1, 25 (D.C.C. 2000) (*quoting* Schenckloth v. Bustamonte, 412 U.S. 218, 225 (1973). Miranda warnings are only required where a subject is in custody and subjected to interrogation. Berkemer v. McCarthy, 468 U.S. 420, 434 (1984) (*see* Rhode Island v. Innis, 446 U.S. 291, 300-301 (1980). For purposes of Miranda, custody takes place when a "formal arrest or restraint on freedom of movement of the degree associated with formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curium). In Thompson v. Keohane, 516 U.S. 99, 112 (1995), the Supreme Court established a two-part inquiry for determining custody: "[f]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Id. Ftnt. 14.

(a) Adams Was Not In Custody and Made Her Statements Spontaneously.

Adams was not in custody when she her luggage was searched. Indeed she was free to leave and did leave following the search of her luggage. Therefore no custodial interrogation took place, and the statements she made about the personal care items in her luggage and how they were in the same condition they were when she bought them at Walmart are admissible.

(b) Hargrove Was Not Subjected to Interrogation and the Circumstances of his Search Were Not Oppressive or Unusual.

Hargrove was not subjected to interrogation by agents at his home after he was taken into custody on the warrant. The statements taken from Hargrove were taken at the FBI Field Office after he executed a written waiver of rights. This is clear because S.A. Ervin took Hargrove's statement and S.A. was not even at Hargrove's house during the search warrant. Further, S.A. Ervin showed Hargrove a series of photos from a photo board which he kept in his office, not in his pocket.

Neither was there anything unusual about the search of Hargrove's home. In his moving papers Hargrove suggests that being awakened early by search teams forcing open his door when he would not answer it collapsed not just his front door, but his will. On the contrary, there was nothing about this entry or search which has been articulated by Hargrove or his counsel that would suggest that Hargrove's will was overborne and that he was coerced into giving a written statement to a different agent hours later. Therefore his motion must fail and his statements should be admitted.

(c) Downs Was Not Subjected to Custodial Interrogation and His Statements Later Were Made After He Waived His Rights.

Downs was not subjected to questioning during the search of his home. The only question he was asked by agents outside of normal booking questions, such as his name, was what Nintendo game he was playing when agents came to the door. His claims about being held for two hours have no significance when measured against the fact that he was arrested some distance from Washington by agents who needed back-up before they could search and transport the defendant. When at last he did make a statement, it was at the Washington Field Office after he executed a waiver of rights form.

He was not questioned he was presented with a consent to search form, which he signed indicating that he knowingly consented to a search of his car and bedroom. He was not asked to make a statement about the case or any crime, but was only asked about whether he would consent to the search, which he did. Therefore his motion to suppress his statements should be denied.

**IV. DEFENDANTS' MOTIONS FOR A BILL OF PARTICULARS SHOULD BE DENIED.**

Defendants seek an order requiring the government to provide a bill of particulars. A bill of particulars should be filed only when necessary to allow the defense to prepare for trial. It is not intended to provide a detailed disclosure of the government's evidence in advance of trial or to force the government to disclose the theory of its case. Here, the extraordinarily detailed motions filed the government alleged multiple overt acts, and a full description of the manner and means of the conspiracy to include each defendant's role. The significance of much of he seized evidence has been outlined in great detail by the government. The discovery provided to the defense is more than adequate to allow the defendants to prepare for trial.

Rule 7 of the Federal Rules of Criminal Procedure authorizes the Court to order the government to file a bill of particulars.  Fed. R. Crim. P. 7(f).  The purpose of a bill of particulars is "to ensure that the charges brought against a defendant are stated with enough precision to allow the defendant to understand the charges, prepare a defense, and perhaps also to be protected against retrial on the same charges."  United States v. Butler, 822 F.2d 1191, 1193 (D.C. Cir. 1987); United States v. Esquivel, 755 F. Supp. 434, 436 (D.D.C. 1987).  The government, however, may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which a defendant committed the crime charged, or to give a preview of its evidence.  See United States v. Torres, 901 F.2d 205, 233-34 (2d Cir. 1990) ("[a]cquisition of evidentiary detail is not a function of a bill of particulars"), cert. denied sub nom, Cruz v. United States, 498 U.S. 906 (1990); United States v. Armocida, 515 F.2d 49, 54 (3d Cir. 1975) (bill of particulars is not intended as a vehicle for "whole sale discovery of the Government's evidence"), Cert. denied sub nom, Gazal v. United States, 423 U.S. 858 (1975).  Nor should the Court compel a bill of particulars to force the government to reveal a theory of its case that the defense could then use to limit the government's presentation of its case at trial.  United States v. Torres, 901 F.2d at 234; United States v. Burgin, 621 F.2d 1352 (5th Cir. 1980), cert. denied, 449 U.S. 1015 (1980).

The constitutional right supporting a bill of particulars request is simply the right to know the offense with which a defendant is charged, not to know the details of how it will be proved.  United States v. Kendall, 665 F.2d 126, 135 (7th Cir. 1981), cert. denied, 455 U.S. 1021 (1982).  Specifically in conspiracy cases, courts have routinely ruled that defendants do not need detailed evidence about the conspiracy in order to adequately prepare for trial.  See, e.g., United States v.

Jimenez, 824 F. Supp. 351, 363-34 (S.D.N.Y. 1993). For example, courts have consistently held that the government is under no obligation to file a bill of particulars detailing facts regarding the existence and formation of the conspiracy. United States v. Rosenthal, 793 F.2d 1214, 1227 (11th Cir. 1986), cert. denied, 480 U.S. 919 (1987); United States v. Deaton, 448 F. Supp. 532, 537 (N.D. Ohio 1978). Nor is the government required to specify every overt act of the conspiracy that it intends to prove at trial, Wong Tai v. United States, 273 U.S. 77 (1926); United States v. Carroll, 510 F.2d 507, 509 (2d Cir. 1975), cert. denied, 426 U.S. 923 (1976), or to disclose exact times and locations of acts committed in furtherance of the conspiracy. United States v. Long, 449 F.2d 288, 294-95 (8th Cir. 1971), cert. denied, 405 U.S. 974 (1972). In United States v. Edelin, a RICO conspiracy case, this Court denied defendants' motion for a bill of particulars and reaffirmed the principle that "[i]t is not the function of a bill of particulars to provide a detailed disclosure of the government's evidence in advance of trial." United States v. Edelin, 128 F. Supp.2d 23, 37 (D.D.C. 2001), quoting Overton v. United States, 403 F.2d 444, 446 (5th Cir. 1968).

Here, the exceptionally detailed allegations against defendants in the government's motions and the comprehensive discovery provide more than adequate information to allow them to prepare for trial. However, the details provided are sufficient, including the date and time of the calls charged, the approximate month and year certain conspirators joined the conspiracy, the date and time of meetings alleged, and other details. Regardless of the fact that exact addresses of events are often not provided, the motions and discover provide adequate notice for trial. The motions filed by the government, including this motion, provide a comprehensive, chronological overview of the government's case in chief. It is a detailed roadmap of the evidence to be

presented against the defendant and their coconspirators.[13]

Furthermore, the motions allege who the government believed which of the defendants were leaders in the conspiracy, which enhancements will apply, and in which acts the individual conspirators participated.

In sum, this extensive discovery provides the defense with more than adequate information to "allow the defendant to understand the charges [and] prepare a defense." United States v. Butler, 822 F.2d 1191, 1193 (D.C. Cir. 1987) (where the indictment is sufficiently specific or if the requested information is available in some other form, a bill of particulars is not required).

Thus, in light of the strict limitations placed on the proper scope of bills of particulars and the detailed information described above in the indictment and discovery, the defendants' request for a bill of particulars should be denied.

## V.  THE DEFENDANTS' MOTIONS FOR A HEARING TO DETERMINE THE SCOPE OF THE CONSPIRACY SHOULD BE DENIED.

Defendants make the claim that they is entitled to a hearing to determine the scope of the conspiracy.[14]  Just because the defense may have to deal with a lot of evidence as proving the government's case, it does follow that the evidence is confusing or needs full, pre-trial, judicial

---

[13]    It is worth noting that federal law does not even require the indictment to allege, or the government to prove, a single overt act in furtherance of a narcotics conspiracy. See United States v. Knuckles, 581 F.2d 305 (2d Cir. 1978), cert. denied, 439 U.S. 986 (1978).

[14]    The government presumes that the other defendants have joined these motions.

review.[15]

In the end, the defendants' only basis for a pre-trial hearing not already addressed by this response appears to be to learn the co-conspirator statements in advance of trial. This is an attempt to have the government preview its evidence and theories, and no more. Therefore this motion should be denied.

While the government will seek to elicit statements under the rule permitting the admission of co-conspirator statements, there is no basis for the Court to conduct a hearing prior to the trial to determine whether such testimony may be admitted.

Federal Rule of Evidence 801(d)(2)(E) provides that statements of co-conspirators made in furtherance of the conspiracy are not hearsay. A statement made by a co-conspirator in furtherance of the conspiracy is admissible against all co-conspirators. United States v. (Joseph) Jackson, 627 F.2d 1198, 1216 (D.C. Cir. 1980). To admit such statements, the government need only prove by a preponderance of the evidence that a conspiracy existed between the defendant and the declarant and that the statement was made in furtherance of the conspiracy. United States v. Beckham, 968 F.2d 47, 51-52 (D.C. Cir 1992) (citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)).

Defendants cite to no case holding that this Court must decide the admissibility of co-conspirator statements in advance of the trial, but only ones that suggest what might or should have been done to make things easier in some cases. This authority should not be persuasive to

---

[15]     The government recognizes that there may be some need to make a determination about other drug acts which are not in the Superseding Indictment. That issue was raised by the government's Notice of Intrinsic, Extrinsic and Other Crimes Evidence. To be clear, the government opposes a motion to define the aspects of the conspiracy which are already referenced in the Superseding Indictment.

this Court.  Indeed, appellate courts have routinely upheld the practice of deferring the

determination of a defense motion until the trial if that motion requires "deciding issues of fact

that are inevitably bound up with evidence about the alleged offense itself."  United States v.

Wilson, 26 F.3d 142, 159 (D.C. Cir. 1994), cert. denied, 514 U.S. 1051 (1995).   In United States

v. Gantt, 617 F.2d 831, 845 (D.C. Cir. 1980), the D.C. Circuit upheld the trial court's refusal to

hold a pretrial hearing into the existence of a conspiracy so as to determine admissibility of

statements under co-conspirators' exception to hearsay rule.  The court explained that "[a]s a

practical matter, to avoid what otherwise would become a separate trial on the issue of

admissibility, the court may admit declarations of co-conspirators 'subject to connection.'"  Id.; see

also Jackson, 627 F.2d at 1218 (trial courts are not required to hold "mini-trials" on the conspiracy

issue before the conditional admission of a co-conspirator's statements); United States v. Edelin,

128 F. Supp.2d 23, 45-46 (D.D.C. 2001) (holding that "hearing to make an advance determination

of conspiracy is unnecessary for the Court's determination by a preponderance of evidence that a

conspiracy existed").

The case of United States v. James, (590 F.2d 575 (5th Cir. 1979), cert. denied, 442 U.S.

917 (1979)), does not stand for the proposition that the Court must determine the admissibility of

co-conspirator statement in advance of trial.  In fact, the court in James recognized that where, as

here, "it is not reasonably practical to require the showing to be made before admitting the

evidence, the court may admit the statement subject to being connected up."  Id. at 582.

In light of these considerations, the Court should reject the defendants' request for a

pretrial hearing relating to co-conspirator statements.  To determine pretrial whether a particular

statement meets the elements for the admission of coconspirator statements, the Court would

essentially have to conduct a trial before the trial. Rule 801(d)(2)(E) requires the government to prove both that the conspiracy exists and that the statement was made in furtherance of the conspiracy. Much of the government's evidence at trial will be presented to prove the existence of the narcotics conspiracy as has been carefully detailed by the government in its recent filings. It would be an enormous waste of judicial resources to present this evidence twice in order to resolve the question of co-conspirator statements in advance of trial. The trial itself is likely to last approximately two months. Neither the federal rules nor prior cases require that the Court undertake such an exercise.

## VII. DEFENDANTS' MOTIONS FOR HEARING ON THE SCOPE OF THE CONSPIRACY, AND TO PRECLUDE ADMISSION OF CO-CONSPIRATOR STATEMENTS SHOULD BE DENIED.

Defendants make the claim that he is entitled to a hearing to determine the scope of the conspiracy.[16] Just because the defense may have to deal with a lot of evidence as proving the government's case, it does follow that the evidence is confusing or needs full, pre-trial, judicial review.[17]

In the end, defendants' only basis for a pre-trial hearing not already addressed by this response appears to be to learn the co-conspirator statements in advance of trial. This is an attempt to have the government preview its evidence and theories, and no more. Therefore

---

[16] The government presumes that the other defendants have joined these motions.

[17] The government recognizes that there may be some need to make a determination about other drug acts which are not in the Superseding Indictment. That issue was raised by the government's Notice of Intrinsic, Extrinsic and Other Crimes Evidence. To be clear, the government opposes a motion to define the aspects of the conspiracy which are already referenced in the Superseding Indictment.

defendants' motion should be denied.

While the government will seek to elicit statements under the rule permitting the admission of coconspirator statements, there is no basis for the Court to conduct a hearing prior to the trial to determine whether such testimony may be admitted.

Federal Rule of Evidence 801(d)(2)(E) provides that statements of co-conspirators made in furtherance of the conspiracy are not hearsay. A statement made by a co-conspirator in furtherance of the conspiracy is admissible against all co-conspirators. United States v. (Joseph) Jackson, 627 F.2d 1198, 1216 (D.C. Cir. 1980). To admit such statements, the government need only prove by a preponderance of the evidence that a conspiracy existed between the defendant and the declarant and that the statement was made in furtherance of the conspiracy. United States v. Beckham, 968 F.2d 47, 51-52 (D.C. Cir 1992) (citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)).

Again, as outlined above, defendants cite to no case holding that this Court must decide the admissibility of co-conspirator statements in advance of the trial.

In light of these considerations, the Court should reject the defendants' request for a pretrial hearing relating to co-conspirator statements. To determine pretrial whether a particular statement meets the elements for the admission of coconspirator statements, the Court would essentially have to conduct a trial before the trial. Rule 801(d)(2)(E) requires the government to prove both that the conspiracy exists and that the statement was made in furtherance of the conspiracy. Much of the government's evidence at trial will be presented to prove the existence of the narcotics conspiracy. Indeed, the pending indictment includes 96 overt acts in furtherance of the narcotics conspiracy. It would be an enormous waste of judicial resources to present this

evidence twice in order to resolve the question of co-conspirator statements in advance of trial. The trial itself is likely to last two months or more. Neither the federal rules nor prior cases require that the Court undertake such an exercise.

## VIII. CONCLUSION

The defendants' various motions are not supported in the law or in fact. The government respectfully requests that their motions be denied.

WHEREFORE, the government requests that the defendants' motions be denied.

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY
DISTRICT OF COLUMBIA

By:___________________________
S. ELISA POTEAT
Bar No.: 420-604
Phone: (202) 514-7067
EMORY V. COLE
Assistant U.S. Attorneys
555 4th Street, N.W.
Washington, D.C. 20530

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing OMNIBUS RESPONSE has been e-mailed on this, the 10th day of August, 2007, to the following attorneys:

____________________
S. ELISA POTEAT
ASSISTANT U. S. ATTORNEY

Defense Counsel:

1) Mr. Howard Bernard Katzoff, Esq.
Counsel for Defendant Lawrence Bryant
katzoffh@aol.com

2) Mr. James W. Rudasill, Jr., Esq.
Counsel for Defendant John Downs
rudasilljr7@aol.com

3) Mr. Nathan Silver, Esq.
Counsel for Defendant Darnell Jackson
nisquire@aol.com

4) Mr. Rudy Acree, Esq.
Counsel for Defendant Bernie Hargrove
Faxed to 202-331-7004

5) Mr. Jensen Barber, Esq.
Counsel for Defendant Keith Roots
jebarber@aol.com

6) Mr. Gary Sidell, Esq.
Counsel for Defendant Lanika Mercedes Franklin
suitcase@verizon.com

7) Mr. Harry Tun
Counsel for Defendant Troy Chavious
Tunharry@aol.com

8)     Mr. Steven J. McCool
       Attorney for Defendant Damon Dixon
       smccool@mallonandmccool.com

9)     Mr. Cary Clennon
       Attorney for Defendant Troy Hopkins
       Clennon_law@comcast.net